# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLOR, POND, and STEELE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist JAROD A. KUYKENDALL**
**United States Army, Appellant**

ARMY 20230238

Headquarters, Joint Readiness Training Center and Fort Polk
Scott Z. Hughes, Military Judge (Motions)
Maureen A. Kohn, Military Judge (Arraignment, Motions, and Trial)
Colonel Leslie A. Rowley, Staff Judge Advocate

For Appellant: Lieutenant Colonel Autumn R. Porter, JA; Lieutenant Colonel Robert D. Luyties, JA; Captain Amir R. Hamdoun, JA (on brief).

For Appellee: Colonel Richard E. Gorini, JA; Captain Anthony J. Scarpati, JA (on brief).

16 December 2025

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

FLOR, Chief Judge:

Appellant was convicted by an enlisted panel, sitting as a general court-martial, contrary to his pleas, of two specifications of sexual assault without consent, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ].[1] He was acquitted of one specification of sexual assault while incapable of consenting, in violation of Article 120, and one specification of assault consummated by a battery, in violation of Article 128.

Appellant raises four assignments of error: 1) whether the military judge erred by denying the defense motion for a continuance; 2) whether appellant's conviction

---

[1] For purposes of clarity and efficiency, subsequent reference to the UCMJ will exclude citation to that work.

for sexual assault without consent under Specification 1, Charge I is sufficient in light of *United States v. Mendoza*; 3) even if sufficient under *Mendoza*, whether appellant's conviction for sexual assault without consent under Specification 1, Charge I is factually sufficient because evidence of [the victim's] intoxication fails to meet the burden of proof required to show lack of consent and there was evidence of both consent and reasonable mistake of fact as to consent; and, 4) whether defense counsel were ineffective for failing to contact and present evidence from essential witnesses in sentencing.[2] Though we discuss each assignment in turn, we affirm the findings, but remand this case for additional factfinding on the issue of ineffective assistance of counsel.

## BACKGROUND

Appellant and the victim were detailed as medics to support Cadet Summer Training (CST) at Fort Knox, Kentucky in May 2022. Both were assigned to Fort Polk, Louisiana but were from different units and had not met prior to CST. During CST, they interacted on an almost daily basis. Appellant was the senior medic for the company that they were both assigned to for CST.

They formed a relationship in June 2022 and engaged in consensual sexual intercourse on two occasions. Appellant was married to someone else at the time. Their relationship ended and as a result they were moved to different teams to avoid working together. Part of the reason for the relationship ending was that the victim had consensual sexual intercourse with someone else during this timeframe.

Appellant continued to pursue the victim romantically after this through text message and in-person while he was intoxicated during the 4th of July weekend. The following weekend, the medics had the weekend off. Four other medics planned a trip to Louisville where they rented an Airbnb. At some point during the trip, one of the medics discovered that she had left her wallet on Fort Knox. The medic who forgot her wallet texted the victim and asked her to bring the wallet. Because the victim had access to a Transportation Motor Pool (TMP) van as a part of her duties, she agreed and brought the wallet to Louisville.

Later, one of the other medics who knew appellant received a text from him stating that he wanted to join the group. The victim agreed to drive appellant from Fort Knox to hang out with this group of medics. After dropping appellant off with the group at the Airbnb, the victim had planned to return to Fort Knox. However, her cell phone died, and she did not have a charger with her, meaning that she did not have a way to guide herself back to Fort Knox. Consequently, the victim

---

[2] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and determine they merit neither discussion nor relief.

changed her plans and spent the night on a couch at the Airbnb. The following morning, the group asked her to stay the rest of the weekend since she had access to the TMP and could drive them around, to which she agreed.

The group spent the day drinking and hanging out. The victim drank two alcoholic seltzer drinks (5% alcohol by volume) and a margarita popsicle about ten inches in length (10% alcohol by volume). She felt drunk and, thinking she would vomit, went into the bathroom and hung over the toilet. After a while, one of the medics set her up in the bedroom with a trash can between her legs in case she got sick. The victim did not remember much after this point, but remembered seeing appellant sitting next to her on the bed. She did not remember what was said after he entered the room. Shortly thereafter, he flipped her over on her stomach, and he penetrated her vagina with his penis. This act constituted the sexual assault without consent in Specification 1 of Charge I, which appellant challenges before this court. The victim described herself as being in and out of consciousness, still severely intoxicated, and able to only recall snapshots. But she remembered appellant having sex with her by penetrating her vagina with his penis while she lay flat on her stomach. She also testified she did not consent.

The victim then went to sleep and woke up alone. A short while later, the victim ate dinner with the rest of the group. After dinner, the victim went to bed and appellant slept in the bed with her. The following morning, appellant tried to kiss the victim and made other attempts to engage her physically. In response to these advances, she kept pushing him away. Separately, she told him that she did not want to have sex with him. Appellant told her, "I'm not going to rape you." He then pushed her onto her back, removed her pants and underwear and had sex with her again. At trial, the victim described appellant's demeanor as "cold" and "stone faced" during this assault. This act constituted the sexual assault without consent in Specification 3 of Charge I, which appellant does not challenge before this court.

The victim helped the group clean up the Airbnb and the whole group went to breakfast. After breakfast, they went to a nearby nature reserve. One of the medics wanted to leave, so the victim drove him back to Fort Knox. On her way back to the reserve, she brought everyone Taco Bell. The victim was the only one not drinking that day, and they all needed a ride back to Fort Knox.

Appellant pulled the victim aside at one point for a private conversation. He told her that he wanted to be together and that he would leave his wife for her. The victim responded by telling him that she had been done with him for a while and that she did not want to have sex that morning. Appellant then lay down in the road and cried. Later, the victim agreed to speak with him at a picnic table at the reserve. Appellant again told her that he loved her, but then he threw up. Appellant became agitated and threw things off the table and continued to cry.

While appellant was agitated, police officers showed up at the reserve since it was past closing time, prompting the group to depart in the TMP. The victim then drove the group to a Walmart parking lot near Fort Knox where she dropped them off. They could not ride in the TMP through the gate since there were no seats with seat belts beyond the driver and front passenger seats. Ten days later, the victim reported the sexual assaults to Army Criminal Investigation Division (CID).

One day before trial, appellant filed a motion for a continuance to explore two ongoing investigations into the victim. After litigating the defense motion during a pre-trial Article 39(a) hearing, the military judge denied the defense request for a continuance, determining neither investigation related to the credibility of the victim.

Based on the foregoing, appellant was convicted of two specifications of sexual assault without consent. During presentencing, appellant's defense counsel called no witnesses. The only mitigating evidence presented comprised a single Army Commendation Medal certificate and appellant's unsworn statement. The military judge sentenced appellant to a dishonorable discharge, confinement for 4 years, and reduction to the grade of E-1.[3]

## LAW AND DISCUSSION

### A. Denial of Defense Motion for a Continuance

#### 1. Additional Facts

The day prior to trial, defense counsel filed a motion for a continuance, having recently been made aware of two investigations into the victim that were ongoing: 1) that the victim had an improper sexual relationship with a staff sergeant in her unit in the last month before trial, and 2) that the victim and other medics in her platoon, including her platoon leader, while in the field, drew blood from a noncommissioned officer using Army medical supplies and then smeared the blood on their faces, smeared the blood on a totem in the woods, and took pictures of their actions.

As of the date of the trial, the command had drafted but not yet signed the appointment orders for the first investigation into the inappropriate relationship. The second investigation into the misuse of Army medical supplies was underway with a suspense date of three days after the first day of appellant's trial.

---

[3] The military judge sentenced appellant to 4 years each for the two specifications of sexual assault. Both sentences were to run concurrently.

The defense requested this continuance to allow appellant the opportunity to confront the victim, if the investigations revealed information relevant to his court-martial. The military judge denied the request for the continuance and placed her findings of fact and conclusions of law on the record using the factors described below from *United States v. Miller*, 47 M.J. 352 (C.A.A.F. 1997).

*2. Law and Analysis*

Article 40 states, "The military judge . . . may, for reasonable cause, grant a continuance to any party for such time, and as often, as may appear to be just."

The standard of review for denial of a motion for continuance is abuse of discretion. *Miller*, 47 M.J. at 358. "Military judges abuse their discretion (1) if the findings of fact upon which they predicate their ruling are not supported by the evidence of record; (2) if they use incorrect legal principles; or (3) if their application of the correct legal principles to the facts is clearly unreasonable." *United States v. Wilson*, 84 M.J. 383, 390 (C.A.A.F. 2024) (citation omitted). The abuse of discretion standard "recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (citation omitted).

> The factors used to determine whether a military judge abused his or her discretion by denying a continuance include "surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, [whether the] moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice."

*Miller*, 47 M.J. at 358. (quoting F. Gilligan and F. Lederer, Court-Martial Procedure § 18-32.00 at 704 (1991)).

The military judge denied defense's request. Though she found that the defense was surprised and, therefore, their request was not untimely, she concluded the evidence from the first investigation, even if substantiated, was not relevant to the victim's credibility and was prohibited under Mil. R. Evid. 412 since the alleged inappropriate sexual relationship occurred after appellant's charged offenses. For the second investigation, the military judge found that even if true, the question of whether the victim violated medical ethics was not relevant to her honesty or truthfulness. Regarding prejudice to appellant, the military judge found that even if substantiated, the allegations would not be relevant and admissible at trial.

After the military judge's ruling, the defense asked whether the drawing of blood could be considered as a potential larceny, which might allow the defense to attack the victim's character for truthfulness under Mil. R. Evid. 608, under a theory of *crimen falsi*.[4] The military judge found evidence of larceny "tenable," concluding the question of improperly drawing blood could be relevant to whether she was derelict in her duties as a medic but not relevant as to whether she was an untruthful person.

We find that the military judge did not abuse her discretion. The military judge did a thorough analysis of the factors in *Miller*, and described why the outcomes of these investigations, even if substantiated, would not be admissible at trial. We agree. Regarding the first investigation, a sexual relationship, even an improper one, that occurred after the offenses committed by appellant, was neither relevant to the victim's credibility nor appellant's guilt. We also agree that under the facts of this case, the nature of the evidence sought to be introduced—the sexual relationship with someone other than appellant—would be inadmissible under Mil. R. Evid. 412. Regarding the second investigation, we agree the drawing of blood and potential misuse of Army medical supplies did not bear on the victim's character for truthfulness.

The defense counsel raised a valid point that the victim could have lied during these investigations, which might have led to a possible impeachment of the victim during cross-examination at trial. However, the military judge pointed out that this possibility was speculative. Denying the defense motion for a continuance on the day of trial—when the justification for the continuance was the mere possibility the victim may lie during an investigation—was not error. The military judge's decision to deny the motion for a continuance was reasonable, within the range of choices available, and cited to the relevant case law supporting her decision.

*B. United States v. Mendoza[5] and the First Sexual Assault[6]*

*1. Additional Facts*

---

[4] *Crimen falsi* refers to "[a]ny other offense that involves some element of dishonesty or false statement." BLACK'S LAW DICTIONARY 429 (9th ed. 2009). These offenses include "[a]cts of perjury, subornation of perjury, false statement, or criminal fraud, embezzlement or false pretense." *United States v. Robertson*, 39 M.J. 211, 215 (C.A.A.F. 1994) (quoting *United States v. Weaver*, 23 U.S.C.M.A. 445, 451, 1 M.J. 111, 118 n.6 (1975)).

[5] *United States v. Mendoza*, 85 M.J. 213 (C.A.A.F. 2024).

[6] For the sake of efficiency, we address both AE II and AE III in this subsection.

For the first sexual assault that occurred on 8 July 2022, the government charged appellant with two different specifications for the same act, alleging different theories of guilt. Specification 1, Charge I charged appellant with sexual assault without consent of the victim.[7] Specification 2, Charge I charged appellant with sexual assault of the victim while she was incapable of consenting due to impairment by an intoxicant.[8]

After the military judge provided instructions on both theories of guilt, the panel convicted appellant of sexual assault without consent (Specification 1) and found him not guilty of sexual assault while the victim was incapable of consenting (Specification 2).

During trial, the government introduced evidence to show the victim's intoxication. As mentioned above, the victim testified she drank two alcoholic seltzer drinks (5% alcohol by volume) and one margarita popsicle of about ten inches in length (10% alcohol by volume). One other witness testified that he saw the victim consume six alcoholic seltzer drinks, but this was the only other witness that described her alcohol intake.[9] The victim testified that she drank so much she felt like she was spinning, a little dizzy, and was stumbling as she walked. She also testified she was very nauseated, resulting in her lying down on the bathroom floor and hugging the toilet. The other soldiers there had to help her to the bedroom where she fell asleep over a trash can. The victim also testified she could only remember snapshots of the sexual assault and was "in and out of consciousness."

Conversely, the defense introduced evidence to show the victim was capable of consenting. The defense elicited testimony from an expert in clinical psychology with expertise in the effects of alcohol on behavior, thinking, and memory. The expert testified that based on the victim's alcohol consumption over the period described during her in-court testimony, and due to her physical size, her Blood Alcohol Content (BAC) would have been approximately .02 to .04. The expert also testified that blackouts typically begin at a BAC of .14.

During closing arguments, the trial counsel argued that the victim was incapable of consenting to sex on 8 July 2022 because of her intoxication. Trial counsel argued, "everyone else knows she was drunk, heavily intoxicated, even the

---

[7] 10 U.S.C. § 920(b)(2)(A).

[8] 10 U.S.C. § 920(b)(3)(A).

[9] This witness was also intoxicated when he observed the victim's alcohol intake. *See also* footnote 10, *infra*.

defense's own witnesses, heavily intoxicated"[10] and "[t]here's no question she was incapable of consenting that afternoon." The defense counsel, on the other hand, argued that the victim was not intoxicated based on the testimony of their expert witness and other testimony that the victim was texting coherently to others in the group.

*2. Law and Analysis*

Appellant argues that his conviction for sexual assault without consent is legally and factually insufficient in light of *United States v. Mendoza*, 85 M.J. 213. We disagree.

We review legal sufficiency through the lens of "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Smith*, 83 M.J. 350, 359 (C.A.A.F. 2023) (citation and internal quotation marks omitted). Because we view the evidence in the light most favorable to the prosecution, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation and internal quotations omitted). This standard for legal sufficiency "'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

We review questions of factual sufficiency "upon request of the [appellant]" and if appellant "makes a specific showing of a deficiency in proof." UCMJ art. 66(d)(1)(B)(i). Once these conditions are met, this court "may weigh the evidence and determine controverted questions of fact" subject to "appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and . . . appropriate deference to findings of fact entered into the record by the military judge." UCMJ art. 66(d)(1)(B)(ii), (I)-(II). If this court is "clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding." UCMJ art. 66(d)(1)(B)(iii). For this court to be "clearly convinced that the finding of guilty was against the weight of the evidence," this court first "must decide that the evidence, *as the* [*court*] *has weighed it*, does not prove that the appellant is guilty beyond a reasonable doubt. Second, the [court] must be clearly convinced of the correctness of this decision." *United States v. Harvey*, 85 M.J. 127, 132 (C.A.A.F. 2024) (internal quotations omitted) (emphasis in original).

---

[10] The trial counsel was referring to the same witness described above who testified he saw the victim drink six alcoholic seltzer drinks. *See also* footnote 11, *infra*.

In order to prove sexual assault without consent, the government had to prove, beyond a reasonable doubt: 1) that appellant committed a sexual act upon the victim by penetrating her vulva with his penis, and 2) that appellant did so without the victim's consent. *See* UCMJ art. 120(b)(2)(A) (elements of sexual assault), *and* UCMJ art. 120(g)(1) (defining "sexual act"). Consent is defined as "a freely given agreement to the conduct at issue by a competent person . . . . Lack of verbal or physical resistance does not constitute consent." UCMJ art. 120(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." UCMJ art. 120(g)(7)(C). As our superior court put it, a charge of sexual assault without consent alleges criminal conduct "upon a victim who is capable of consenting but does not consent." *Mendoza*, 85 M.J. at 220.

In this case, the government charged appellant with both sexual assault without consent and sexual assault while incapable of consenting due to impairment by alcohol for the same sexual act. "[N]othing prevents the Government from charging a defendant with both offenses under inconsistent factual theories and allowing the trier of fact to determine whether the victim was capable or incapable of consenting." *Id.* (citation omitted). The victim's intoxication level may be relevant, even in lack of consent cases as the factfinder may consider "evidence of the victim's intoxication when determining whether the victim consented." *Id.* at 222. The dividing line between without consent and incapable of consenting is that the government cannot prove the absence of consent "by merely establishing that the victim was too intoxicated to consent." *Id.*

Mistake of fact as to consent is a defense to sexual assault if "the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial [R.C.M.] 916(j)(1). Because sexual assault without consent is a general intent crime, "the ignorance or mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* Once raised, the government bears the burden to prove beyond a reasonable doubt that the defense did not exist. R.C.M. 916(b)(1).

Here, we find the evidence legally and factually sufficient to convict appellant of sexual assault without consent under Article 120(b)(2)(A). We disagree with appellant that the only evidence of lack of consent in this case was the evidence of the victim's intoxication. First, the victim testified on direct that she remembered appellant penetrating her vagina with his penis and that she did not consent to the sexual act with appellant. Second, while the victim stated that she was in and out of consciousness, she was able to describe being flipped over on her stomach after appellant came into the room and saw her with a trash can in her lap. Finally, the victim made three outcry reports shortly after the assault.

The government did not just charge sexual assault without consent and then argue solely incapable of consenting due to impairment by alcohol. As mentioned above, the government charged two competing theories and allowed the panel to determine whether the victim was capable of consenting. While the government did lean heavily on the victim's intoxication level throughout trial and in closing argument, defense relied on their expert witness to argue that the victim "was not too intoxicated to consent." Given this contrast in argument, coupled with the circumstantial and direct evidence noted above, we find ample evidence to affirm appellant's conviction.

The evidence supporting a mistake of fact defense was weak. The defense counsel presented testimony from one witness that he observed the victim give appellant a hand job on the first night at the Airbnb, but this witness's credibility was significantly called into question.[11] Appellant also relies upon interactions between the victim and appellant before and after the assault, as well as some of the victim's counterintuitive behavior – texting for food rather than asking for help after the assault, choosing to sit next to appellant, cuddling with appellant in front of others, and telling another Soldier she wanted to sleep with appellant the same day as the assault – to support his mistake of fact defense. However, the victim testified she "didn't remember" telling another Soldier that she wanted to sleep next to appellant, and she only admitted to putting her feet in appellant's lap on the first night instead of cuddling.

Like the factfinder at trial, we find that the government met its burden to prove beyond a reasonable doubt there was no mistake of fact as to consent.

### C. Ineffective Assistance of Counsel on Sentencing

### 1. Additional Facts

The entire defense sentencing case consisted of two things: 1) a single Army Commendation Medal certificate; and 2) the unsworn statement of appellant,

---

[11] First, the government successfully called into question this witness's credibility through cross-examination, to include the fact that he was heavily intoxicated to the point that he passed out in a chair and the other medics drew on him with a marker and put a piece of popcorn in his glasses—a picture of the witness passed out was admitted as Prosecution Exhibit 18. Next, the government highlighted that the witness did not inform CID of this alleged hand job in his original sworn statement. Lastly, the government elicited testimony regarding the significant changes in the witness's sworn testimony during cross-examination. During the Mil. R. Evid. 412 motions hearing, the witness was 100% certain he witnessed the victim giving appellant a hand job of his bare penis; in contrast, his trial testimony was that he was 80% certain he saw the victim give appellant a hand job over the clothes.

consisting of fourteen lines in the written record of trial.[12] The defense called no witnesses, and defense counsel's sentencing argument consisted of two-and-a-half pages in the written record of trial.

On appeal, appellant argues his defense counsel were ineffective for failing to investigate and present evidence from essential witnesses during sentencing. In support of his claim, appellant filed affidavits from potential witnesses, to include from his platoon sergeant and family members. The affidavits from appellant's family—his wife, father, and grandmother—averred that defense counsel never approached them about the option to give testimony on appellant's character until after sentencing was complete. Appellant's father and grandmother additionally claimed they did not speak with the defense counsel until the defense counsel were attempting to console them post-sentencing. After considering appellant's claim, we ordered affidavits from defense counsel.

Defense counsel claimed that, despite their repeated requests, appellant never provided a written list of possible sentencing witnesses. Nonetheless, defense counsel stated that they interviewed close friends, family members, and military personnel in appellant's leadership with a view towards building a sentencing case.

The defense counsel believed appellant's family members (wife, father, and grandmother) were not favorable sentencing witnesses because they were upset with appellant for cheating on his pregnant wife. The defense counsel had never heard mention that appellant's platoon sergeant would be willing and able to provide favorable presentencing testimony. Appellant never gave them her name, nor was her name raised by any other witness they interviewed. Nevertheless, after reviewing the platoon sergeant's affidavit, submitted in conjunction with appellant's brief to this court, defense counsel stated they still would not have called her as a witness. In support of this conclusion, defense counsel explained the government could have used the fact that appellant, as the senior medic for the victim's team, used his position to commit the offenses on cross-examination of appellant's platoon sergeant. Additionally, they found the platoon sergeant's endorsement of appellant tepid at best.

Defense counsel also considered calling appellant's best friend, SPC ■ but his testimony during a motions hearing and at trial, described *supra* footnote 10, undermined him as a credible witness. Mainly, the defense counsel highlighted that SPC ■ along with other witnesses, did not have anything bad to say about appellant, but also had nothing particularly good to say about appellant either. Calling these witnesses, however, would have further enabled the government to emphasize its

---

[12] The unsworn statement given by appellant was unremarkable, consisting of an apology to the victim, without mentioning anything about his background or time in the Army.

aggravation evidence—namely that the victim was a subordinate and that appellant was a married man to a pregnant wife at the time of the offenses. The defense also wanted the military judge to focus on appellant's unsworn statement, which appellant drafted with input from his defense counsel.

*2. Law and Analysis*

We review claims of ineffective assistance of counsel de novo. *United States v. Cueto*, 83 M.J. 323, 327 (C.A.A.F. 2022) (citing *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011)). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient, and that appellant was prejudiced by the error." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland v. Washington*, 466 U.S. 668, 698 (1984)).

To establish deficiency, appellant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" when evaluating counsel's performance. Id. at 689. This presumption can be rebutted by "showing specific errors [made by defense counsel] that were unreasonable under prevailing professional norms." *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F. 2001) (cleaned up, citations omitted).

Prejudice is established by "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Appellant must show "'a reasonable probability that, but for counsel's [deficient performance] the result of the proceeding would have been different.'" *Captain*, 75 M.J. at 103 (citing *Strickland*, 466 U.S. at 694). In other words, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted). Further, in assessing an ineffective assistance of counsel claim, we can analyze *Strickland's* performance and prejudice prongs independently, and if appellant fails either prong, his claim must fail. *Strickland*, 466 U.S. at 687. Thus, an appellate court:

> need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an [ineffective assistance of counsel] claim on the ground of lack of sufficient prejudice, which *we expect will often be so*, that course should be followed.

Id. at 697 (emphasis added).

Our superior court addressed sentencing ineffective assistance of counsel in *United States v. Scott*, 81 M.J. 79 (C.A.A.F. 2021). Ineffective assistance of counsel in sentencing may occur if defense "fails to investigate adequately the possibility of evidence that would be of value to the accused in presenting a case in extenuation and mitigation or, having discovered such evidence, neglects to introduce that evidence before the court-martial." *Id.* at 84 (internal citations omitted). Prejudice may still occur in sentencing if there is "a reasonable probability that there would have been a different result if all available mitigating evidence had been exploited by the defense." *Id.* at 84-85 (internal citations omitted).

In this case, we are unable to resolve whether the defense counsel were ineffective in sentencing because we are faced with conflicting affidavits. As mentioned above, the defense counsel state in their affidavits that they interviewed the close family members, while the affidavits from the close family members state that they were not interviewed.

When approaching a case with affidavits in conflict with each other such as this one, we turn to the principles laid out in *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997). If an appellant raises an allegation of ineffective assistance that would result in relief, and the allegation is not resolvable on the record, we are to order affidavits from defense counsel. *Id.* If those affidavits materially conflict with the assertions raised by appellant, we are "required to order a factfinding hearing . . . ." *Id.*

The affidavits present a factual dispute which we are unable to resolve under the first and fourth principles of *Ginn*.[13] Thus, we find that we must order a factfinding hearing. *See United States v. Scott*, ARMY 20170242, 2018 CCA LEXIS 522, at *20 (Army Ct. Crim. App. 30 Oct. 2018) (mem. op.) ("We cannot avoid the factual dispute contained in the conflicting affidavits."), aff'd, 81 M.J. 79 (C.A.A.F. 2021). Therefore, we remand this case for an evidentiary hearing pursuant to Article 66(f)(3), UCMJ, and *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967), to answer the following questions:

1. What steps did defense counsel take to investigate and present matters in extenuation and mitigation during appellant's presentencing proceedings?

---

[13] The first *Ginn* principle states: "if the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis." *Ginn*, 47 M.J. at 248. The fourth: "if the affidavit is factually adequate on its face but the appellate filings and the record as a whole 'compellingly demonstrate' the improbability of those facts, the Court may discount those factual assertions and decide the legal issue." *Id.*

2. Did appellant provide his defense counsel with names and contact information of possible sentencing witnesses? If so, what information was provided? What steps did defense counsel take to interview these witnesses? Alternatively, were their conclusions that certain witnesses would not provide beneficial testimony based on conversations with appellant? What steps did they take to investigate and interview any other potential sentencing witnesses?

3. Why did defense counsel not present any witnesses or additional evidence during appellant's presentencing proceedings, beyond appellant's unsworn statement and an Army Commendation Medal? Why did defense counsel not call appellant's platoon sergeant? Why did they not call appellant's father, wife, or grandmother who were present in the gallery during presentencing proceedings?

4. Given *United States v. Wheeler*, 17 U.S.C.M.A. 274, 38 C.M.R. 72 (1967), what independent investigation did defense counsel conduct into the characteristics of appellant, to include his education, upbringing, and good military character?

5. Were there strategic or tactical reasons for not calling any witnesses to testify during presentencing proceedings?

6. What input did defense counsel provide to appellant when he was fashioning his unsworn?

## CONCLUSION

On consideration of the entire record, the findings of guilty are AFFIRMED.

In light of this court's inability to resolve conflicting affidavits presented on appeal, we are unable to affirm the sentence in this case without additional factfinding. The record of trial is returned to The Judge Advocate General for such action as is required to conduct a *DuBay* hearing under Article 66(f)(3), UCMJ, to answer the aforementioned questions.

Upon conclusion of the *DuBay* hearing, the record will be returned to this court for further review.

Senior Judge POND and Judge STEELE, concur.

FOR THE COURT:

JAMES W. HERRING, JR.
Clerk of Court

14